IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

|  |  |  |
|---|---|---|
| NORCA INDUSTRIAL COMPANY, LLC and VINLONG STAINLESS STEEL (VIETNAM) COMPANY, LTD., | ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| and | ) ) | |
| SONHA SSP VIETNAM SOLE MEMBER COMPANY LIMITED, | ) ) ) | |
| *Plaintiff-Intervenor* | ) ) | |
| v. | ) ) | Ct. No. 25-00132 |
| THE UNITED STATES, | ) ) | |
| *Defendant*, | ) ) | |
| and | ) ) | |
| FELKER BROTHERS CORPORATION and PRIMUS PIPE & TUBE, INC., | ) ) ) | |
| *Defendant-Intervenors*. | ) ) | |

ORDER

Upon consideration of plaintiffs' motion for judgment upon the administrative record,

response thereto, reply, and all other papers, it is hereby

ORDERED that the motion is denied, and it is further

ORDERED that judgment shall enter in favor of the United States.

Dated: _____

_____
Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

|  |  |
|---|---|
| NORCA INDUSTRIAL COMPANY, LLC and VINLONG STAINLESS STEEL (VIETNAM) COMPANY, LTD.,<br>　　　　*Plaintiffs*,<br><br>　　　　and<br><br>SONHA SSP VIETNAM SOLE MEMBER COMPANY LIMITED,<br>　　　　*Plaintiff-Intervenor*,<br><br>　　　　v.<br><br>THE UNITED STATES,<br>　　　　*Defendant*,<br><br>　　　　and<br><br>FELKER BROTHERS CORPORATION and PRIMUS PIPE & TUBE, INC.,<br>　　　　*Defendant-Intervenors*. | **PUBLIC VERSION**<br><br>Ct. No. 25-00132<br><br>*Business Proprietary Information Redacted on Pages 4 and 28* |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**RULE 56.2 MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

<table>
<tr><td></td><td>BRETT A. SHUMATE<br>Assistant Attorney General</td></tr>
<tr><td></td><td>PATRICIA M. McCARTHY<br>Director</td></tr>
<tr><td><em>Of Counsel:</em></td><td>CLAUDIA BURKE<br>Deputy Director</td></tr>
<tr><td>CHARLIE CHUNG<br>Attorney<br>Office of the Chief Counsel<br>　for Trade Enforcement & Compliance<br>U.S. Department of Commerce</td><td>MOLLIE L. GROPP<br>Senior Counsel for Management<br>U.S. Department of Justice<br>Civil Division<br>Washington, DC</td></tr>
<tr><td>April 22, 20226</td><td><em>Attorneys for Defendant</em></td></tr>
</table>

**TABLE OF CONTENTS**

                                                                                          **Page**

STATEMENT PURSUANT TO RULE 56.2 ................................................................ 2

    I.    The Administrative Determination under Review ........................................... 2

    II.   Issues Presented for Review .......................................................................... 2

STATEMENT OF FACTS ......................................................................................... 3

    I.    Initiation of the Administrative Review ........................................................ 3

    II.   *Preliminary Results* ...................................................................................... 6

    III.  *Final Results* ............................................................................................... 8

SUMMARY OF ARGUMENT .................................................................................. 11

ARGUMENT .......................................................................................................... 12

    I.    Standard of Review ...................................................................................... 12

    II.   Commerce's Selection of Morocco as the Primary Surrogate Country
          Is Supported by Substantial Evidence and in Accordance with the Law ...................... 14

        A.   Legal Framework for Surrogate Country Selection .............................................. 14

        B.   Commerce Provided a Lawful, Well-Reasoned Explanation
            for Selecting Morocco as the Primary Surrogate Country .................................... 16

    III.  Commerce's Application of Total Adverse Facts Available to Vinlong
          Is Supported by Substantial Evidence and in Accordance with the Law ...................... 23

        A.   Legal Framework for Application of Total Adverse Facts Available .................. 23

        B.   Commerce Provided a Lawful, Well-Reasoned Explanation
            for Applying Total Adverse Facts to Vinlong ...................................................... 26

CONCLUSION ........................................................................................................ 32

CERTIFICATE OF COMPLIANCE ........................................................................ 33

**TABLE OF AUTHORITIES**

**Cases**                                                                                                          **Page**

*Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984)...................................................... 13

*Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137 (Fed. Cir. 1987)........................ 13

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966)................................................................. 13

*Corinth Pipeworks Pipe Indus. SA v. United States*, 154 F.4th 1356 (Fed. Cir. 2025) ............... 30

*Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006)........................... 14, 19

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) ........................................ 25, 26

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
   216 F.3d 1027 (Fed. Cir. 2000)........................................................................................... 25, 26

*Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*,
   No. 10-00059, 2011 WL 4829947 (Ct. Int'l Trade Oct. 12, 2011)............................................ 30

*Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006)..................... 13

*Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1335 (Ct. Int'l Trade 2019)....................... 27

*Heze Huayi Chem. Co. v. United States*, 532 F. Supp. 3d 1301 (Ct. Int'l Trade 2021) .............. 19

*INS v. Elias-Zacarias*, 502 U.S. 478 (1992) ............................................................................. 13

*Jiaxing Bro. Fastener Co. v. United States*,
   11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) (*Jiaxing I*)............................................................ 16

*Jiaxing Bro. Fastener Co. v. United States*, 751 F. Supp. 2d 1345 (Ct. Int'l Trade 2010)........... 23

*Jiaxing Bro. Fastener Co. v. United States*,
   822 F.3d 1289 (Ct. Int'l Trade 2016) (*Jiaxing II*).............................................................. 15, 16

*KYD, Inc. v. United States*, 607 F.3d 760 (Fed. Cir. 2010) ........................................................ 26

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016)............................... 18, 28

*Nation Ford Chem. Co. v. United States*, 166 F.3d 1373 (Fed. Cir. 1999) ............................ 15, 16

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)................................... passim

*Nucor Corp. v. United States*, 612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) .............................. 13

*Oman Fasteners, LLC v. United States*, 125 F.4th 1068 (Fed. Cir. 2025)............................. 18, 28

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990)...................................... 25

*Shandong Huarong Gen. Corp. v. United States*,
   159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) ......................................................................... 13

*Timken Co. v. United States*, 699 F. Supp. 300 (Ct. Int'l Trade 1988)...................................... 13

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009)................................................................. 12

*Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998) ................................. 13, 29

*Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333 (Fed. Cir. 2011)................. 15


**Statutes**

19 U.S.C. § 1516a........................................................................................................... 12

19 U.S.C. § 1673............................................................................................................. 14

19 U.S.C. § 1677(18)(A).................................................................................................... 3

19 U.S.C. § 1677b(c) ................................................................................................... passim

19 U.S.C. § 1677e(a)................................................................................................... passim

19 U.S.C. § 1677e(b) ................................................................................................... passim

19 U.S.C. § 1677m(d) .................................................................................................. 23, 24

19 U.S.C. § 1677m(e) .............................................................................................. 24, 28, 29

**Other Authorities**

*Aluminum Extrusions from {China}: Final Affirmative Determination of Sales at Less
    Than Fair Value*, 89 Fed. Reg. 80506 (Dep't of Commerce Oct. 3, 2024),
    and accompanying Issues and Decision Mem. (*Aluminum Extrusions from China*).......... 10, 20

*Certain Corrosion-Resistant Steel Products from {China}: Final Determination of Sales at Less
    Than Fair Value { . . .}*, 81 Fed. Reg. 35316 (Dep't of Commerce Jun. 2, 2016), and
    accompanying Issues and Decision Mem. (*CCRSP from China*)................................... 9, 17, 18

*Certain Frozen Warmwater Shrimp from the Republic of Indonesia: Final Negative
    Countervailing Duty Determination*, 78 Fed. Reg. 50,383 (Dep't of Commerce
    August 19, 2013), and accompanying Issues and Decision Mem. (*Shrimp from Indonesia*)... 21

Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection
    Process, Policy Bulletin 04.1 (2004), *http://enforcement.trade.gov/policy/bull04-1.html*
    (last accessed April 20, 2026) (Policy Bulletin 04.1) ......................................................... passim

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    88 Fed. Reg. 62,322, 62,328 (Dep't of Commerce Sept. 11, 2023) ........................................... 3

*Welded Stainless Steel Pressure Pipe from the Socialist Republic of Vietnam:
    Final Results of Antidumping Duty Administrative Review; 2022-2023*,
    90 Fed. Reg. 22,060 (Dep't of Commerce May 23, 2025) (*Final Results*),
    and accompanying Issues and Decision Memorandum (IDM).......................................... passim

*Welded Stainless Steel Pressure Pipe From the Socialist Republic of Vietnam:
    Preliminary Results of Antidumping Duty Administrative Review; 2022–2023*,
    89 Fed. Reg. 65,849 (Dep't of Commerce Aug. 13, 2024), and accompanying
    preliminary decision memorandum (PDM) ........................................................................ passim

**Rules**
Ct. Int'l Trade Rule 56.2.................................................................................................................. 1

**Regulations**
19 C.F.R. § 351.308(c)(1)(i)-(iii)................................................................................................. 25
19 C.F.R. § 351.408(c)(2)............................................................................................................ 15

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

|  |  |
|---|---|
| NORCA INDUSTRIAL COMPANY, LLC and VINLONG STAINLESS STEEL (VIETNAM) COMPANY, LTD., <br>    *Plaintiffs*, <br><br> and <br><br> SONHA SSP VIETNAM SOLE MEMBER COMPANY LIMITED, <br>    *Plaintiff-Intervenor*, <br><br> v. <br><br> THE UNITED STATES, <br>    *Defendant*, <br><br> and <br><br> FELKER BROTHERS CORPORATION and PRIMUS PIPE & TUBE, INC., <br>    *Defendant-Intervenors*. | **PUBLIC VERSION** <br><br> Ct. No. 25-00132 <br><br> *Business Proprietary Information Redacted on Pages 4 and 28* |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
RULE 56.2 MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 56.2 of the Court's rules, defendant, the United States, respectfully responds to the motion for judgment on the administrative record filed by plaintiffs, Norca Industrial Company, LLC (Norca) and Vinlong Stainless Steel (Vietnam) Co., Ltd. (Vinlong) (collectively, plaintiffs), which plaintiff-intervenor, Sonha SSP Vietnam Sole Member Company, Limited (Sonha) joins in part. Pl. Mem., Dec. 23, 2025, ECF Nos. 29 (sealed); 30 (public) (Pl. Br.); Pl-Int. Ntc., Dec. 30, 2025, ECF No. 31. The parties challenge two aspects of the Department of Commerce's (Commerce) *Final Results* of the 2022-2023 administrative review of the antidumping duty order covering welded stainless steel pressure pipe from the Socialist

Republic of Vietnam (Vietnam)—specifically, Commerce's selection of Morocco over Indonesia as primary surrogate country and Commerce's application of total adverse facts available to Vinlong. As we demonstrate below, Commerce's determination is supported by substantial evidence and is in accordance with law. Accordingly, we respectfully request that the Court sustain Commerce's *Final Results* and deny plaintiffs' motion for judgment on the administrative record.

**STATEMENT PURSUANT TO RULE 56.2**

**I.     The Administrative Determination under Review**

The administrative determination under review is *Welded Stainless Steel Pressure Pipe from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 22,060 (Dep't of Commerce May 23, 2025) (*Final Results*), P.R. 211,[1] and accompanying Issues and Decision Memorandum (IDM), P.R. 206. The period of review is July 1, 2022, through June 30, 2023.

**II.     Issues Presented for Review**

1.     Whether Commerce's selection of Morocco as the primary surrogate country is in accordance with the law and supported by substantial evidence.

2.     Whether Commerce's application of total adverse facts available to Vinlong is in accordance with the law and supported by substantial evidence.

---

[1] Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the underlying administrative review.

**STATEMENT OF FACTS**

**I.      Initiation of the Administrative Review**

In September 2023, Commerce initiated the 2022-2023 administrative review of the antidumping duty order covering Vietnamese welded stainless pressure pipe.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 62,322, 62,328 (Dep't of Commerce Sept. 11, 2023), P.R. 3.  Commerce selected two mandatory respondents: Sonha and Vinlong.  IDM at 1.  Domestic producers, Bristol Metals LLC, Felker Brothers Corporation, and Primus Pipe & Tube, Inc. (collectively, petitioners) requested this administrative review.  IDM at 2 (n.4).

Because Vietnam is a non-market economy country, Commerce selects one or more market-economy countries to act as surrogates in the valuation of respondents' factors of production.  *See* 19 U.S.C. §§ 1677(18)(A), 1677b(c).  Commerce identified a non-exhaustive list of six potential market-economy surrogates at the same level of economic development as Vietnam during the period of review—including Indonesia and Morocco—and invited comments from interested parties.  P.R. 32; *see* 19 U.S.C. § 1677b(c)(4).  In response, petitioners argued that Commerce should select Morocco as the primary surrogate country because it was a significant producer of comparable merchandise and the Moroccan record data was superior to that of Indonesia.  *See* IDM at 11-17.  Respondents argued that Commerce should select Indonesia because it was a producer of identical merchandise (rather than merely comparable, at best) and the Indonesian data was allegedly superior.  *See id.*

Commerce also requested information from respondents to calculate dumping margins. *See, e.g.*, *Re: Administrative Review of the Antidumping Duty Order on welded stainless steel pressure pipe from {Vietnam}: Request for Information* (Dep't of Commerce, Nov. 27, 2023)

(Initial Quest.), P.R. 28.  Commerce expressed its expectation that respondents "calculate the per-unit factor amounts based on the actual inputs used during the {period of review}."  *Id.* at D1.  If not so reporting, then respondents were expected to "provide a detailed explanation{s} of all efforts undertaken to report the actual quantity for each {factor}," as well as "how {the entity} derived {its} estimated {factors of production} consumption," and "why the methodology {it} selected is the best way to accurately demonstrate an accurate consumption amount."  *Id.* at D2.

Vinlong timely responded in December 2023 and January 2024.  *E.g., Welded Stainless Pressure Pipe from {Vietnam} – Section D Response* (Jan. 22, 2024) (Vinlong Sec. D Resp.), P.R. 59; C.R. 80.  In relevant part, Vinlong stated that its "{factors of production} data is based on the quantities consumed during the {period of review} as reported in its accounting system" and it had "relied on actual inputs" "{t}o calculated the per-unit factor amounts."  *Id.* at D-2. However, Vinlong also incorporated by reference its response to a subsequent question, in which Vinlong clarified that its prior statement was not entirely the case because Vinlong had identified issues with its accounting.  *Id.* at D2-D4, D9.  In particular, Vinlong reported that its factors database reflected an unusually [                          ] that [                          ] and was "likely due to [

].."  *Id.* at D4.  Vinlong reported that its accountant only conducted [

], whereas the period of review is not the same as the fiscal year.  *Id.*  Vinlong reported that it had been audited and inspected by authorities, however, with no concerns raised.  *Id.* at D4-D5.  For purposes of this review, Vinlong proposed an alternative method of reporting the per unit factor amount of steel material, in which Vinlong would [

].  *Id.* at D5.

Commerce requested additional information. *Welded Stainless Steel Pressure Pipe from {Vietnam}: Section AD Supplemental Questionnaire* (Dep't of Commerce, May 2, 2024) (Suppl. Quest.), at 7-9, P.R. 83; C.R. 93. Vinlong responded that it had since "reviewed {its} entire accounting system and accounting books" and has "realized that there are deficiencies in the control of accounting books." *Welded Stainless Pressure Pipe from {Vietnam} – Submit Response to D Supplemental Questionnaire* (May 23, 2024) (Vinlong Suppl. Sec. D Resp.), at SD-Pages 2-4, P.R. 92; C.R. 104. Vinlong explained that "this led to inaccuracies in the records of steel materials issued into production and the balance of work in progress." *Id.* "This lack of control originated from the previous Chief Accountant, who is no longer working at Vinlong." *Id.* Vinlong further reported that it "cannot investigate further to determine the reasons for these errors and rectify them." *Id.*

In sum, while Vinlong could reconcile its accounting on a fiscal year basis, which matched the calendar year, "Vinlong {could not} reconcile steel input used per subject output to the inventory count during the {period of review}." *Id.* at SD-Page 4. Vinlong reiterated, however, that auditing authorities had allegedly not identified any concerns with its accounting on a fiscal (calendar) year basis. *Id.* at SD-Pages 3-4. Vinlong further attempted to reassure Commerce that it was now "implementing solutions to correct {its accounting on a monthly basis}," as the period of review is different from their accounting period in crossing calendar years. *Id.* at SD-Page 4. Lastly, Vinlong reiterated its proposed alternative scrap method, but provided little additional explanation or justification. *Id.* at SD-Page 2.

5

II.    *Preliminary Results*

In August, 2024, Commerce issued its preliminary results. *Welded Stainless Steel Pressure Pipe from {Vietnam}: Preliminary Results of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 65,849 (Dep't of Commerce Aug. 13, 2024), and accompanying Preliminary Decision Memorandum (PDM), at 5, P.R. 175.  No party disputed that Morocco and Indonesia were at the same level of economic development as Vietnam during the period of review.  *See* PDM at 11-14; Pl. Br. at 5.  Commerce also found that both Morocco and Indonesia were significant producers of comparable merchandise.  PDM at 14-16.  Commerce further found that, as between the two countries, the Moroccan surrogate value data on record were more specific in terms of HS code categories for valuing material inputs.[2]  *Id.*  Accordingly, Commerce preliminarily chose Morocco as the primary surrogate country based on the superior quality of the Moroccan record data.  *Id.* at 16.

Additionally, Commerce preliminarily determined to calculate Vinlong's dumping margin based on adverse facts available.  *Id.* at 5-6.  Commerce reasoned that Vinlong had failed to place the necessary information on record for Commerce to calculate an accurate dumping margin.  PDM at 4-5.  Commerce reasoned that Vinlong was "not able to provide an accurate {factors of production database} because it was unable to provide correct consumption rates for its material inputs."  *Id.* at 5.  It could neither "correct its errant consumption rate," nor "accurately invoice its input consumption for the {period of review}."  *Id.* at 6.

---

[2] The administrative record refers to the Harmonized Tariff Schedule (HTS) and Harmonized System (HS) code categories when discussing surrogate values for certain inputs of welded stainless pressure pipe.  HS codes are standardized 6-digit international codes used to classify traded products globally.  HTS codes are country-specific extensions (up to 12 digits). The first 6 digits of an HTS code are the same as the international HS code.

While Vinlong had proposed an alternative to reporting its actual consumption rate, Commerce preliminarily determined that this "scrap method" was unusable. *Id.* at 6-7. Because the scrap method approach applied a multiplier only to scrap, a narrow subset of Vinlong's production data, Commerce determined that the resulting rate would be unreliable and unverifiable (*i.e.*, traceable back to its books and records). *Id.* Furthermore, Commerce preliminarily determined that an adverse inference was appropriate when selecting among facts otherwise available because Vinlong had not acted to the best of its ability in producing its factors database. *Id.*

Interested parties responded to the preliminary results in case briefs and rebuttal case briefs. *See* IDM at 2 & 2 (n.5-6). With respect to the selection of the primary surrogate country, Vinlong, Sonha, and Norca argued, among other things, that Commerce should select Indonesia because Indonesia produces goods *identical* to the subject merchandise (*i.e.*, welded steel pressure pipe) and, therefore, provides product-specific surrogate value data. *Id.* at 7, 9. In response, petitioners argued that the law requires only a *comparable* product, not an identical one, and Commerce considers a variety of processed steel products to be comparable for purposes of surrogate value selection. *Id.* at 8. Petitioners argued that Commerce should select Morocco because Morocco was a significant producer of comparable goods (*i.e.*, other low value-added steel products) and the Moroccan record data were superior to that of Indonesia. *Id.*

With respect to the application of total adverse facts available against Vinlong, Vinlong admitted to the "shortcomings in its accounting." *See id.* at 3; Vinlong's Case Br., Sept. 23, 2024 at 1, P.R. 186. But those shortcomings, Vinlong argued, did not justify resort to other facts, or adverse facts, because Vinlong had "never withheld any requested information," providing "all Vinlong had and could provide," in timely filings. Vinlong Case Br. at 3. Vinlong further

7

alleged that it had not impeded the investigation because it had offered a viable, alternative scrap method. *Id.* Vinlong also objected to the application of total adverse facts available, arguing that Commerce should accept all other data from Vinlong that, it alleged, were "correctly reported." *Id.* at 4.

The petitioners expressed support for application of total adverse facts available. *See* IDM at 4. Petitioners emphasized that Vinlong's "consumption and scrap rates" were "essentially made up following the departure of {Vinlong's} accountant." Pet. Rebuttal Br. at 26-27, P.R. 196 (citing Vinlong's Case Br. at 4). Petitioners further objected to the reliance on any non-steel input values because Vinlong had failed to cite any record evidence to support its assertion that it had passed various audits with no issues identified. *Id.* An adverse inference was appropriate, moreover, because "Vinlong's accounting was inadequate . . . to calculate {an accurate} dumping margin," and it should not "obtain a more favorable result by failing to cooperate." *Id.* at 27 (citing early pre-preliminary comments).

## III.    *Final Results*

On May 23, 2025, Commerce published its *Final Results* in which it continued to rely on Morocco as the primary surrogate country and continued its application of total adverse facts against Vinlong. IDM at 3-17.

Commerce continued to select Morocco as the primary surrogate country because Morocco was at the same level of economic development as Vietnam and a significant producer of comparable merchandise during the period of review; further, Morocco's superior surrogate value data were the best available data on the record. *Id.* at 11-17. Commerce reasoned that the Moroccan low-value added steel products (MLVSP), *e.g.*, "rebar, wire coils, and flats" were comparable to the subject merchandise (Vietnamese welded stainless steel pressure pipe) based

on long-standing practice. *Id.* at 11. For example, Commerce has previously found that low-value added "flat products" of steel—such as "slabs, hot rolled coil, cold-rolled coil, coated steel products, tinplate and heavy plate"—are comparable to low-value added "long products"—such as "billets, blooms, rebars, wire rod, sections, rails, sheet piles, and drawn pipe." *Id.* (citing, *e.g.*, *Certain Corrosion-Resistant Steel Products from {China}: Final Determination of Sales at Less Than Fair Value { . . .}*, 81 Fed. Reg. 35316 (Dep't of Commerce Jun. 2, 2016) (*CCRSP from China*), and accompanying Issues and Decision Memorandum, at 4); *see also CCRSP from China* IDM at 24 ("{W}e have long cited flat {steel} products and long "steel" products as examples of comparable merchandise{.}").

Likewise, Commerce recognized that "circular steel pipe and tube" are comparable to "rectangular steel pipe and tube, hot-rolled steel sheet and plate, *steel wire rod* {emphasis added}, steel wire ripe, *steel bar* {emphasis added}, and structurals." IDM at 11 (citing Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), *http://enforcement.trade.gov/policy/bull04-1.html* (last accessed April 20, 2026) (Policy Bulletin 04.1). These are all "low value-added products of roughly similar form (made by combining iron, energy, and further processing)." Policy Bulletin 04.1. *Accord CCRSP from China* IDM at 25 (citing same). Commerce further found that it would not depart from its long-standing practice in this review based on "alleged peculiarities" in respondents' own production of the subject merchandise (welded stainless steel pressure pipe). IDM at 11.

In addition, Commerce continued to find that the Moroccan record data were superior to the Indonesian record data. *Id.* at 11-17. The ten-digit HTS code Moroccan data on record were more specific than the eight-digit HS code Indonesian data on record. *Id.* at 11-13. Commerce

9

also articulated concerns and flaws in the Indonesian data. *Id.* at 14-15. For example, Commerce determined that the sole Indonesian financial statements on record, from PT Steel Pipe Industry of Indonesia Tbk (SPINDO), were not suitable as a source for surrogate financial ratios. *Id.* at 14. Notwithstanding respondents' arguments to the contrary, SPINDO was the beneficiary of subsidies found to be countervailable, whereas the financial statements on record from two Moroccan entities show no benefits from subsidies found to be countervailable. *Id.* at 14-16. In choosing between the Indonesian statements (expressly found to be countervailable), and the Moroccan statements (with only "'general' allusions to government subsidization"), Commerce explained that it has a "clear" preference for the latter. *Id.* at 17 (citing *Aluminum Extrusions from {China}: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 8056 {*stet* 80506} (Dep't of Commerce Oct. 3, 2024) (*Aluminum Extrusions from China*, and accompanying Issues and Decision Memorandum, at cmt. 6 and page 23). Accordingly, Commerce determined to retain Morocco as the primary surrogate country.

Commerce further determined to continue applying total adverse facts available to Vinlong. IDM at 3-6. First, resort to other facts available was "warranted, because Vinlong could not provide Commerce with an accurate accounting of its consumption of inputs and was not able to correct its errant consumption rate in it books and records." *Id.* at 5. Consistent with the statutory criteria for resorting to other facts, Commerce explained that Vinlong could not provide the necessary information to calculate an accurate dumping margin and, therefore, necessary information was missing from the record; the information was not provided after multiple requests; and the information Vinlong provided could not be verified. *Id.* (citing 19 U.S.C. § 1677e(a)(1) & (a)(2)(B), (D)). Vinlong's proposed alternative "scrap method"

approach failed to fill the gap.  *Id.* at 4-5.  The scrap method suffered "shortcomings" that "have not changed since the issuance of the *Preliminary Results*," Commerce reasoned, adding that the alternative approach cannot "accurately {be} traced back to {Vinlong's} books and records."  *Id.*

Second, Commerce was justified in applying an adverse inference when selecting among adverse facts.  Vinlong had failed to maintain adequate records during the period of review, and its alternative scrap method approach did not relieve Vinlong of that obligation.  *Id*. at 4-5. "{T}his failure to maintain adequate records is tantamount to a failure to fully cooperate in the proceeding," justifying Commerce's resort to an adverse inference in selecting among other facts available.  *Id.* (citing the *Preliminary Results* and *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003) (recognizing the failure to maintain appropriate records may be a basis for resort to adverse facts)).  Resort to total adverse facts available also was appropriate in light of the record in this review and the statutory purpose.  IDM at 5-6.

## SUMMARY OF ARGUMENT

Commerce's *Final Results* are supported by substantial evidence and in accordance with law.  Commerce selected Morocco as the primary surrogate country based on a reasoned determination that, during the period of review, Morocco was at a level of economic development comparable to Vietnam and a significant producer of comparable merchandise. While Indonesia was also economically comparable and a significant producer of identical (and therefore comparable) merchandise, the Moroccan surrogate value data were superior.  First, Commerce reasonably found that the Moroccan ten-digit HS codes were more specific than the Indonesian eight-digit HS codes.  Second, the sole Indonesian financial statements were not suitable because the source for the statements was the beneficiary of subsidies previously found

to be countervailable.  In contrast, the Moroccan financial statements were sourced from two companies and neither had been found to have received countervailable subsidies.

Commerce's application of total adverse facts available against Vinlong was also lawful and based on substantial evidence.  Commerce reasonably determined that Vinlong had not acted to the best of its ability in failing to provide reliable factors of production data.  Vinlong had conceded that its factors database contained errant data that Vinlong could not correct.  While Vinlong had encouraged Commerce to use Vinlong's alternative "scrap method" to re-calculate the errant rate, the approach's shortcomings left it unsuitable—in particular, Commerce found that the results under the scrap method were not reliable or verifiable.  In the absence of the required factors of production data, Commerce was unable to calculate Vinlong's dumping margin.  Moreover, this was the direct result of Vinlong's failure to maintain adequate records and thus to exert its best effort in this administrative review.  Accordingly, Commerce did not err in applying total adverse facts available to Vinlong.  Commerce's reasoned analysis should be sustained and judgment entered in favor of the United States.

## ARGUMENT

### I.      Standard of Review

The Court will uphold Commerce's antidumping duty determination if it is supported by "substantial evidence on the record" and is otherwise "in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 315 n.6 (2009).  Substantial evidence is "more than a mere scintilla" of relevant evidence; however, the standard is satisfied by "such relevant evidence as a

12

reasonable mind might accept as adequate to support a conclusion . . . ."  *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (internal quotations and citations omitted).

"{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).  Rather, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, as here, the agency's conclusions may be set aside only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion.  *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *accord Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1287 (Ct. Int'l Trade 2009).

Thus, "the Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion." *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001).  This is equally true even if the Court might "justifiably have made a different choice had the matter been before it *de novo*."  *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (internal quotations and citations omitted).  "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (citations omitted).  Nor is it necessary for Commerce to provide an explicit explanation where its path is reasonably discernible; specifically, a decision of "less than ideal clarity" may still be upheld. *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998) (quoting *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987)).

13

**II.    Commerce's Selection of Morocco as the Primary Surrogate Country
Is Supported by Substantial Evidence and in Accordance with the Law**

Plaintiffs challenge Commerce's selection of Morocco over Indonesia as the primary

surrogate country.  For the reasons that follow, and as reflected in the law and the record,

plaintiffs' challenges lack merit.  Commerce's primary surrogate country selection is lawful and

supported by substantial evidence.

**A.    Legal Framework for Surrogate Country Selection**

An antidumping duty represents the amount by which the "normal value" of subject

merchandise exceeds its "export price (or the constructed export price)."  19 U.S.C. § 1673.  In

proceedings involving a non-market economy, such as Vietnam, Commerce determines the

subject merchandise's normal value by relying on the "best available information" from a market

economy country or countries to derive surrogate valuations for a respondent's factors of

production, including raw materials, labor, and utilities.  *See* 19 U.S.C. § 1677b(c).  To those

factors, Commerce also adds "an amount for general expenses and profit plus the cost of

containers, coverings, and other expenses."  *Id*. § 1677b(c)(1)(B).

The statute requires that Commerce use, "to the extent possible," surrogate factors from

"one or more market economy countries that are— (A) at a level of economic development

comparable to that of the nonmarket economy country, and (B) significant producers of

comparable merchandise."  *Id.* § 1677b(c)(4)(A)-(B).  Economic comparability is determined

based on per capita gross national income (GNI).  Policy Bulletin 04.1.  In turn, the statutory

requirement for comparable merchandise is satisfied if the merchandise is identical.  *Id.*

However, the statute only uses the word "comparable," not "identical;" therefore, it is well-

established that Commerce is *not* limited to selecting only from among producers of identical

merchandise.  19 U.S.C. § 1677b(c)(4)(B); Policy Bulletin 04.1; *Dorbest Ltd. v. United States*,

14

462 F. Supp. 2d 1262, 1273-74 (Ct. Int'l Trade 2006).  Depending on the subject merchandise, Commerce may judge comparability in different ways.  Policy Bulletin 04.1.  For example, Commerce may identify "comparable merchandise on the basis of physical differences in the merchandise and whether the product is one of low or high value-added."  *Id*.  Commerce then considers whether a possible surrogate country is a "significant producer" of that comparable merchandise.  *Id.*

If more than one market economy country is economically comparable and a significant producer of comparable merchandise, then Commerce selects "the country with the best factors data . . . {to be} the primary surrogate country."  Policy Bulletin 04.1.  By statute, Commerce must select the "best available information" on record to value the factors of production.  *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1293 (Ct. Int'l Trade 2016) (*Jiaxing II*) (citing 19 U.S.C. § 1677b(c)).  However, because the statute is silent regarding what constitutes the "best available information," Commerce possesses "broad discretion" in deciding what record evidence meets the criteria.  *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011); *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("wide discretion").  In practice, Commerce selects, to the extent practicable, surrogate values that are product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of review, and free of taxes and duties.  *See* Policy Bulletin 04.1; *Jiaxing II*, 822 F.3d at 1293 (discussing requirements).

Commerce also has a regulatory preference to use as much data as possible from a single primary surrogate country.  *See* 19 C.F.R. § 351.408(c)(2); *Jiaxing II*, 822 F.3d at 1294 n.3 (citing Policy Bulletin 04.1).  Commerce will "only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable."  *See Jiaxing Bro.*

*Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1332–33 (Ct. Int'l Trade 2014) (*Jiaxing I*) (citations omitted), *aff'd*, *Jiaxing II*, 822 F.3d at 1289.

The data relied on need not be perfect. *Jiaxing II*, 822 F.3d at 1301. Nor is Commerce required to duplicate the precise experience of the manufacturer in the non-market economy. *Nation Ford*, 166 F.3d at 1377. Instead, Commerce seeks to identify and rely on the record data that "most accurately represents the fair market value" of the relevant factor of production. *Id.* Accordingly, given Commerce's discretion to determine the "best available information," and the fact-specific nature of this deferential case-by-case inquiry, "{t}he question {for the Court} is not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing II*, 822 F.3d at 1300-01.

There is no hierarchy among these criteria. For example, Commerce recognizes that data quality is a critical consideration because a country that meets the statutory criteria may still be unsuitable as a primary surrogate if crucial factor price data are inadequate or unavailable. Policy Bulletin 04.1. Commerce seeks to satisfy the breadth of the criteria and weighs the evidence considering the particular facts of the industry and the record. *See* PDM at 12.

### B. Commerce Provided a Lawful, Well-Reasoned Explanation for Selecting Morocco as the Primary Surrogate Country

Commerce's selection of Morrocco as the primary surrogate county is in accordance with the law and supported by substantial evidence. The record fully supports Commerce's conclusion that Morocco was at a comparable level of economic development to Vietnam, a significant producer of comparable merchandise during the period of review, and provided the best available data for valuing the factors of production. IDM at 11-17. Specifically, Commerce determined, in accordance with its longstanding practice, that Morocco was a significant

16

producer of comparable low value-added steel products, including steel rebar, wire coils and flats, and the record contained superior Moroccan data for valuing the factors of production. *See id.* at 11.

Plaintiffs argue that Morocco is not a significant producer of comparable merchandise because the Moroccan low value-added steel products are allegedly not comparable to the Vietnamese welded stainless steel pressure pipe under review. *See* Pl. Br. 7-9. However, plaintiffs fail to counter Commerce's well-reasoned analysis based on Commerce's long-standing practice as published in Policy Bulletin 04.1 and discussed in *CCRSP from China*. *See* IDM at 11 (discussing Policy Bulletin 04.1 and *CCRSP from China* IDM at 24). Policy Bulletin 04.1 is explicit: "if *circular steel pipe* and tube were the subject merchandise, then *rectangular steel pipe* and tube, hot-rolled steel sheet and plate, *steel wire rod*, steel wire rope, *steel bar* . . . would constitute comparable merchandise." Policy Bulletin 04.1 (emphasis added). In turn, *CCRSP from China* recognized that various low value-added "*flat* and *long* {steel} products are {comparable} steel products, even though they involve different sizes and shapes (or different properties depending on the specifications)." *CCRSP from China* IDM at 24. Consistent with these authorities, and in the absence of contrary evidence on the record, Commerce found, similarly, that the Moroccan low-value added steel products were comparable to the subject merchandise, welded stainless steel pressure pipe. IDM at 11.

Plaintiffs' response boils down to two objections. First, plaintiffs argue that other low value-added steel products are allegedly, by definition, "not comparable products" because they "are all {the} subject of separate and distinct antidumping and countervailing duty investigations." Pl. Resp. at 8. Plaintiffs cite no legal support for such a narrow reading of the statutory requirement. And we are aware of none. Their narrow reading would render

17

meaningless the statutory criteria for "comparable," not necessarily identical, merchandise. *See* 19 U.S.C. § 1677b(c)(4)(B).

Second, plaintiffs contend that Commerce was unjustified in concluding that the Moroccan low value-added *carbon* steel products were comparable to the low value-added *stainless* steel, subject merchandise. Pl. Br. at 8-9 (emphasis added). But plaintiffs cite no record evidence showing that the subject welded *stainless* steel pressure pipe is particularly different from any other low value-added steel product. *See* Pl. Br. at 6-9. Instead, they cite only to vague record assertions that the subject merchandise is a "specialized product," but do not explain (with reference to any evidence in the record) how the subject welded stainless steel pressure pipe is meaningfully different from other low value-added steel products for purposes of the comparability inquiry. *See* Pl. Br. at 7-8 (citing Pet. Surrogate Country Cmts., at 2, P.R. 56). Elsewhere in plaintiffs' brief, they further state that the subject merchandise "is *not* further worked than cold-rolled / hot-rolled," which would make it seemingly comparable to the "steel coils" referenced in the authorities relied on by Commerce. *See* Pl. Br. at 10. *Cf.* IDM at 11 (finding "flat products" of steel—such as "slabs, hot rolled coil, *cold*-rolled coil, {etc.} comparable to the subject merchandize (relying on *CCRSP from China* IDM at 4, 24)) (emphasis added).

Interested parties, including plaintiffs, carried the burden of creating an adequate record during the administrative proceeding. *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337-38 (Fed. Cir. 2016); *accord Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1075 (Fed. Cir. 2025). In the absence of record evidence to the contrary, Commerce reasonably (i) rejected plaintiffs' speculations lacking citation to the record and (ii) adhered to its long-

standing practice of finding various shapes and sizes of low value-added steel products comparable.

Plaintiffs go so far as to argue that Commerce should never have looked to Morocco at all, once it was apparent that Indonesia was a significant producer of *identical* merchandise. Pl. Br. at 6 (arguing "{t}his fact alone warranted Commerce selecting Indonesia instead of Morocco as the primary surrogate country"). This argument mischaracterizes the statutory criteria, in which the term "identical" does not appear in the statute; instead, the statute only requires Commerce to choose among surrogate countries that are "significant producers of *comparable* merchandise." 19 U.S.C. § 1677b(c)(4)(B) (emphasis added). As this Court explains: "The statute does not require Commerce to find a producer of identical merchandise, but rather a producer of comparable merchandise." *Dorbest*, 462 F. Supp. 2d at 1273-74.

Moreover, "{t}hough Commerce has indicated a preference for identical goods, that preference must sometimes take second-seat if the use of identical goods leads to data selection problems." *Id.* at 1274. "{I}f considering a producer of identical merchandise leads to data difficulties, the operations team may consider countries that produce a broader category of reasonably comparable merchandise." Policy Bulletin 04.1. Accordingly, Commerce will not exercise a preference for identical goods in selecting surrogate countries at the expense of having to rely on lower quality data.

Plaintiffs misplace reliance on *Heze Huayi Chem. Co. v. United States*, 532 F. Supp. 3d 1301, 1314-16 (Ct. Int'l Trade 2021). *See* Pl. Br. at 6. In *Heze*, the Court recognized Commerce's preference to select as primary surrogate a country that produces identical merchandise, but the Court does not hold, or even suggest, that this preference overrides data quality considerations. *Heze*, 532 F. Supp. 3d at 1314-16. Furthermore, in *Heze*, unlike in this

review, Commerce determined that the producer of identical product, Mexico, had superior data on record. *Id.*

In this case, Commerce reasonably determined that the data from Mexico, a producer of comparable merchandise, were superior to the data from Indonesia, a producer of comparable merchandise that was also identical. IDM at 11-17. First, Commerce found that the Moroccan ten-digit level HS code categories were more specific than the Indonesian eight-digit level HS code categories. *Id.* at 11-13. In so finding, Commerce relied on its long-standing practice to find higher-digit HS categories more specific than lower-digit HS categories in the absence of record evidence to the contrary. *Id.* (citing *Aluminum Extrusions from China* IDM at 21).

In response, plaintiffs argue that the "Morocco {HS} categories are not more specific than Indonesia in any significant respect{}," but they fail to explain exactly how and where in the record it shows that the eight-digit level categories allegedly "give more precise word descriptions of stainless steel coils used." *See* Pl. Br. at 10. Similarly, plaintiffs assume, without reference to the record, that the presence of 0000 at the end of higher-digit HS categories necessarily means that there is no difference in product specificity between the higher- and lower-digit HS categories. *See id.* (comparing Moroccan and Indonesian HS code numbers for stainless steel coils). Commerce reasonably dispensed with these purely speculative arguments at the administrative level. IDM at 11-13 (citing *Aluminum Extrusions from China*). In the absence of any specific record evidence demonstrating that the eight-digit Indonesian HS categories were more specific, Commerce did not unreasonably find that the ten-digit Moroccan HS code categories were more specific. *See* IDM at 11-13.

In any event, Commerce determined there was another independent basis to favor Morocco over Indonesia as the primary surrogate country. IDM at 14-17. The sole source of Indonesian

20

financial statements, SPINDO, was the beneficiary of subsidiary that Commerce found to be countervailable—specifically, an Export Working Capital Loan from Indonesia's Export-Import (EXIM) Bank. *Id.* at 14 (citing *Certain Frozen Warmwater Shrimp from the Republic of Indonesia: Final Negative Countervailing Duty Determination*, 78 Fed. Reg. 50,383 (Dep't of Commerce August 19, 2013) (*Shrimp from Indonesia*), and accompanying Issues and Decision Memorandum (IDM) at 6-7, 16). In contrast, there was only a suggestion of subsidies in the Moroccan financial statements and these had not be found to be countervailable. *Id.* at 15-17.

In response, plaintiffs argue that there is no evidence that SPINDO *benefited* from the countervailable subsidies, citing SPINDO's interest rate on the countervailable working capital loan and the loan's relatively small percentage of SPINDO's total funding. Pl. Br. at 12. This is factually incorrect. Pl. Br. at 12. It is undisputed that Commerce determined that an Export Working Capital Loan from Indonesia's Export-Import Bank (EXIM Bank Program) is countervailable. IDM at 15; *see Shrimp from Indonesia* IDM at 6-7. Plaintiffs also do not dispute that SPINDO received countervailable export financing. IDM at 15; *see* Pl. Br. at 12 ("{T}the SPINDO financial statement indicates that the interest rate on the Indonesian EXIM bank loan … was 9-9.5%").

Contrary to plaintiffs' argument, Pl. Br. at 12, it also is irrelevant that Commerce made a negative final determination in *Shrimp from Indonesia* as to the benefits conferred to shrimp companies in that review. *See Shrimp from Indonesia* IDM at 6-7. This is a different record, with a different product, in an antidumping duty order review. *See* IDM at 14 ("{W}e note that the *de minimis* subsidy finding, as it related to the shrimp companies that were under investigation, is distinct from our finding that export loans from EXIM bank conferred countervailable subsidy benefits."). Furthermore, "this is not a countervailing duty investigation

21

of SPINDO, but rather an assessment of their public financial statements' eligibility for use as a source to derive surrogate financial ratios." *Id.* at 14-15. Commerce reasonably questioned the reliability of SPINDO's financial statements because SPINDO used a subsidy program that Commerce previously found countervailable. *See id.* Whether the benefit SPINDO received was significant or *de minimis* is irrelevant to whether SPINDO's financial statements were reliable. *Id.* at 15.

In contrast, the record contains financial statements from two Moroccan producers, Maghreb Steel (Maghreb) and Sonsaid S.A. (Sonsaid), which demonstrate that the Moroccan entities did not receive any subsidy that Commerce previously found countervailable in other proceedings. IDM at 15-18. Plaintiffs do not directly dispute this material distinction. *See* Pl. Br. at 12-14. Instead, plaintiffs argue that Commerce should still have disregarded Maghreb and Sonsaid's statements because the statements allegedly suffer from "major defects," including various subsidies, debt receivables, liabilities, and debt forgiveness from the Moroccan government, and contain no auditor notes. *Id.* at 12-13. With respect to Maghreb, plaintiffs argue that the financial statement admits risks associated with heavy indebtedness to the Moroccan government accounting for 82 percent of the company's equity. *Id.* Plaintiffs further cite Maghreb's request to the World Trade Organization for an extension of safeguard measures on hot-rolled products. *Id.* at 13 (citing Pet. Add'l Surrogate Value Info., Jul. 1, 2024, Ex. 27, at 80, P.R. 135). Plaintiffs further contend that "Sonasid's financial statement suffers from similar issues." *Id.* (citing Pet. Add'l Surrogate Value Info., Jul. 1, 2024, Ex. 28, at 4-5, 21, 65, 71, P.R. 138).

Commerce reasonably concluded that the alleged infirmities were a "demerit against the Moroccan financial statement{s}," but the Moroccan data were still superior to the Indonesian

22

data given that the Moroccan producers had not been found to be in receipt of a countervailable subsidy like the Indonesian producer.  IDM at 16; *see also id.* at 17-18 (cmt. 3).  As this Court has recognized, it is Commerce's longstanding practice to disregard financial statements when an entity is known or suspected to have "received actionable subsidies."  *Jiaxing Bro. Fastener Co. v. United States*, 751 F. Supp. 2d 1345, 1352 (Ct. Int'l Trade 2010).  Unlike SPINDO who had indisputably received a countervailable subsidy, and thus an "actionable" subsidy, Commerce did not unreasonably conclude that the alleged subsidies to Meghreb and Sonsaid were not "actionable."  *Cf. id.*; IDM at 16.

In sum, Commerce reasonably selected Morocco over Indonesia as the primary surrogate country having determined, based on long-standing practice and record evidence, that Morocco was a significant producer of comparable merchandise and sourced superior data than Indonesia.

## III.    Commerce's Application of Total Adverse Facts Available to Vinlong Is Supported by Substantial Evidence and in Accordance with the Law

Commerce determined to apply total adverse facts available to Vinlong based on Vinlong's failure to place a complete and accurate factors database on the record, or to suggest a reliable and verifiable alternative to fill gaps in its database, which failures were the direct result of Vinlong's admittedly inadequate recordkeeping.  IDM at 3-6.  Commerce's determination is supported by substantial evidence and in accordance with law.

### A.    Legal Framework for Application of Total Adverse Facts Available

If Commerce determines that an interested party provides a deficient response to a request for information, then Commerce shall notify the interested party of the nature of the deficiency and, to the extent practicable, afford an opportunity to cure.  19 U.S.C. § 1677m(d).  If any further response remains unsatisfactory, or is not submitted within applicable time limits,

then Commerce may disregard all or part of the original and subsequent responses, as appropriate. *Id.*; *see also* 19 U.S.C. § 1677m(e) (outlining threshold criteria).

If disregarding information, Commerce follows a two-step process to determine whether to fill gaps in the record with facts otherwise available and, if so, whether to use an adverse inference when selecting among those facts. 19 U.S.C. § 1677e(a)-(b). First, Commerce considers whether (1) necessary information is not available, *or* (2) an interested party (A) withholds information requested by Commerce, (B) fails to provide the information in the form or in the manner requested, (C) significantly impedes the proceeding, or (D) provides information that cannot be verified. *Id.* § 1677e(a). If *any* of these criteria are met, Commerce "shall, subject to section 1677m(d) of this title {*i.e.*, notice and opportunity to cure}, use the facts otherwise available in reaching the applicable determination." *Id.* § 1677e(a) (emphasis added). Second, Commerce considers whether a respondent "has failed to cooperate by not acting to the *best of its ability* to comply with a request for information." *Id.* § 1677e(b)(1) (emphasis added). If Commerce concludes this is the case, then Commerce may apply an adverse inference in selecting among the facts otherwise available. *Id.*

This Court has clarified Congress's intent with respect to statutory section. "The focus of subsection (a) is respondent's *failure to provide information*," justifying Commerce's look to other facts; "{t}he reason for the failure is of no moment." *Nippon Steel*, 337 F.3d at 1381. In contrast, "{t}he focus of subsection (b) is respondent's *failure to cooperate to the best of its ability*," and this failure justifies the adverse inference. *Id.*

A respondent fails to act to the "best of its ability" when it does not "put forth its *maximum effort* to provide Commerce with *full and complete answers* to all inquiries in an investigation." *Id.* at 1382 (emphasis added). The best-of-one's-ability standard "does not

24

require perfection and recognizes that mistakes sometimes occur," but "it does not condone inattentiveness, carelessness, or *inadequate record keeping*." *Id.* (emphasis added). The standard expects respondents "(a) take reasonable steps to keep and maintain full and complete records . . .; (b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question." *Nippon Steel*, 337 F.3d at 1382.

"While intentional conduct, such as deliberate concealment or inaccurate reporting, surely evinces a failure to cooperate, the statute does not contain an intent element." *Id.* at 1383. An adverse inference may be appropriate "regardless of motivation or intent." *Id.*; *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) ("{p}roviding false information and failing to produce key documents unequivocally demonstrate {a lack of} maximum effort").

"Because Commerce lacks subpoena power, Commerce's ability to apply adverse facts is an important one." *Essar Steel*, 678 F.3d at 1275. Its "purpose . . . is 'to provide respondents with an incentive to cooperate' . . ., not to impose punitive damages." *Id.* (quoting *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)). "Without the ability to enforce full compliance with its questions, Commerce runs the risk of gamesmanship and lack of finality in its investigations." *Id.*; *accord Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190-91 (Fed. Cir. 1990) (discussing potential for gamesmanship).

When applying an adverse inference, Commerce may rely on information derived from any stage of the proceeding, including the petition, a final determination in the investigation, any previous review, or any other information placed on the record. *See* 19 U.S.C. § 1677e(b); *see also* 19 C.F.R. § 351.308(c)(1)(i)-(iii). Notably, by statute, Commerce "is not required to determine, or make adjustments to, {a dumping margin} . . . based on any assumptions about

25

information the interested party would have provided if the interested party had complied with the request for information." 19 U.S.C. § 1677e(b)(1). As this Court explains, "{a}n appropriate decision based on adverse facts is 'a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance.'" *Essar Steel*, 678 F.3d at 1275 (quoting *F.lli De Cecco*, 216 F.3d at 1032). "A decision based on adverse facts is not punitive when determined in accordance with statutory requirements . . . ." *Id.* (citing *KYD, Inc. v. United States*, 607 F.3d 760, 767–68 (Fed. Cir. 2010)).

### B.    Commerce Provided a Lawful, Well-Reasoned Explanation for Applying Total Adverse Facts to Vinlong

Commerce lawfully applied total adverse facts available to Vinlong based on substantial evidence in the record. IDM at 3-6. First, resorting to other facts was appropriate because Vinlong had failed to provide Commerce with the necessary information to calculate Vinlong's dumping margin, even after multiple requests, and the information Vinlong provided could not be verified. *Id.* at 5 (19 U.S.C. § 1677e(a)(1) & (a)(2)(B), (D)); *see also* Pl. Br. at 15-17 (conceding the data supplied an errant rate). Second, resorting to adverse inference was appropriate because the standard "does not condone {the kind of} inattentiveness, carelessness, or inadequate record keeping," as Vinlong had conceded led to their deficient factor reporting. *Id.* at 4-5 (quoting *Nippon Steel*, 337 F.3d at 1382-83). Accordingly, Commerce reasonably determined to apply adverse facts available to Vinlong. *Id.* at 5-6.

While Vinlong had proposed an alternative "scrap method" to reconcile the discrepancy caused by its inadequate record keeping, Commerce reasonably found the alternative approach unusable. IDM at 4-5. The "scrap method" continued to suffer from the shortcomings identified in the *Preliminary Results* as it was dependent on only a narrow subset of Vinlong's production data and Vinlong's own admittedly inaccurate books and records. *Id.*; PDM at 6; Vinlong Sec. D

26

Resp. at D-5. The approach could not "accurately be traced back to {Vinlong's} books and records." IDM at 5.

Plaintiffs argue that Commerce erred in rejecting the "scrap method" without verifying the data used to employ the method. *See* Pl. Br. at 18-19 (citing *Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1335, 1343 (Ct. Int'l Trade 2019)). This argument lacks merit. First, Commerce asked Vinlong to provide more detailed explanation and information on it scrap method in Commerce's Supplemental Questionnaire. *See* Suppl. Ques. at 8-9. Commerce received and considered Vinlong's timely response, but Commerce still found it inadequate. IDM at 4-6; PDM at 6.

As Commerce further explained, even if all underlying data were flawless, the scrap method is an overly simplified linear application of an estimated modifier to already flawed steel input data; Commerce did not unreasonably conclude that the resultant rate from such a calculation was not reliable or verifiable. *See* IDM at 4. Additionally, the scrap production data is only a fraction of Vinlong's total production. *See* Vinlong Supp. Sec. D Resp. at 8, Exh. SD-4. Commerce's rejection of the scrap method was not "cursory" as alleged, *see* Pl. Br. at 19, but reasoned based on shortcomings in Vinlong's proposed approach, *see* IDM at 4-5.

Plaintiffs further argue that, even if Commerce was justified in rejecting Vinlong's steel conversion factor of production, it was allegedly unreasonable for Commerce to reject Vinlong's United States sales data and data supporting other factors of production, including hydrogen, argon, nitrogen, scrap, direct labor, indirect labor, electricity, and water. Pl. Br. at 19-22. However, considering Vinlong's admittedly inappropriate record keeping, Commerce reasonably found that Vinlong could not provide an accurate accounting of its consumption of all inputs. *See* IDM at 5; PDM at 5. *Cf.* Vinlong Suppl. Sec. D. Resp. at SD-Page 3.

27

Vinlong also received notice and opportunity to cure.  For example, concerning Vinlong's use of hydrogen, argon, and nitrogen, Commerce sought further explanation in a supplemental questionnaire, Suppl. Quest. at 7-8, and received Vinlong's supplemental response, Vinlong Suppl. Sec. D Resp. at SD-Page 1-2.  Moreover, Vinlong's response suggested that the shortfalls in its accounting extended beyond one material input; Vinlong stated it had "realized that there are deficiencies in the control of accounting books." *Id.* at SD-Page 2.  Assuming so, it is not unreasonable for Commerce to be concerned that any shortfalls in record-keeping might extend beyond the deficiency in the one material input that Vinlong affirmatively disclosed.  For example, Commerce reasonably concluded that Vinlong failed to provide accurate water consumption data in both its initial and supplemental questionnaire responses because Vinlong allegedly had [          ] water meter to monitor [                    ].  *See* Vinlong Suppl. Resp. at SD-Page 5.

Indeed, Vinlong has continued to assert, from its initial response through its supplemental response and briefing, that unspecified authorities had audited and inspected its financial statements and found "no issues."  Vinlong Case Br. at 6-7; Vinlong Br. at 16-18.  But Vinlong has never supported these assertions with citation to any audits or similar evidence in the record. It is well-established that interested parties, not Commerce, carries the burden of creating an adequate record in an administrative proceeding.  *Oman Fasteners*, 125 F.4th at 1075; *Nan Ya Plastics*, 810 F.3d at 1337-38.

Vinlong further erroneously contends that Commerce committed legal error by allegedly failing to consider the statutory criteria before disregarding all information and data Vinlong submitted.  Pl. Br. at 21.  Section 1677m(e) provides the Commerce may not decline to consider less than ideal information if that information otherwise meets five statutory criteria.  In

28

consideration of these criteria, Commerce recognized, under sub-section (e)(1), that Vinlong's

factors database and United States sales data were timely submitted. IDM at 9-11. Throughout

the administrative review, however, it expressed concerns about the reliability of that

information in light of the admitted shortfalls in accounting of one of the factors. *See* Suppl.

Quest. at 7-9. While Commerce expressed this concern without expressly referencing the criteria

in section 1677m(e)(2)-(5), and did not explicitly and separately run through the criteria for each

production factor, Commerce's reasoned path to disregarding the factors database is reasonably

discernible. *See Wheatland Tube*, 161 F.3d at 1369-70. Afterall, Vinlong had conceded that

"there are deficiencies in the control of accounting books," and a deficiency Vinlong expressly

identified concerned a core input. Vinlong Suppl. Sec. D Resp., at SD-Pages 2-4.

Plaintiffs further argue that, even if resort to other facts were appropriate, the record

allegedly does not support an adverse inference. Pl. Br. at 22-24. Plaintiffs' argument is

unpersuasive. Plaintiffs unduly focus on Vinlong's lack of intent to shirk reporting requirements

while failing to acknowledge that the "best of its ability" standard in 19 U.S.C. § 1677e(b)(1)

does not condone "inadequate record keeping." *Nippon Steel*, 337 F.3d at 1382. Moreover,

Vinlong was unable to fill gaps in this inadequate record keeping in response to a supplemental

questionnaire. *See, e.g.*, Suppl. Quest. at 7-9; Vinlong Suppl. Sec. D. Resp. at SD-Page 1-5.

Plaintiffs further misapprehend the record in claiming that Commerce impermissibly

cited the same rationale for using adverse inferences as it cited for using facts available in the

first instance. Pl. Br. at 23-24 (citing IDM at 5; PDM at 5-6). Commerce cited several reasons

for resorting to other facts, and all were statutorily appropriate. For example, necessary

information to value Vinlong's a core input was not available, *i.e.*, actual steel input. IDM at 4-

5. Commerce also found that Vinlong had failed to provide the necessary data in the form

requested—specifically, Vinlong had offered its scrap method to estimate steel input instead of providing actual steel input data. *Id.* Commerce further found that the steel input data that would be derived from Vinlong's scrap method could not be verified with reference to Vinlong's books and records. *Id.* These are all statutorily appropriate reasons for resorting to other facts. 19 U.S.C. § 1677e(a)(1) & (a)(2)(B), (D).

In turn, Commerce cited to a separate and distinct basis for resorting to an adverse inference when selecting among other facts—specifically, the fact that Vinlong's inadequate record keeping was the admitted cause of the record infirmities. IDM at 4-5. This justification for adopting an adverse inference was appropriate. Inadequate record keeping is one of several recognized bases for resorting to adverse facts. *Nippon Steel*, 337 F.3d at 1382-83. Contrary to plaintiffs' argument, Commerce neither relied on the same reasons and bases for resorting to adverse facts and an adverse inference, nor did Commerce simply repeat the legal standard as a conclusion. Commerce's rationale was fully laid out and supported by substantial evidence in the record.

Lastly, plaintiffs challenge Commerce's determination to apply total adverse facts available rather than partial adverse facts limited to the steel factors of production data. *See* Pl. Br. at 24-25. "Commerce is not obligated in every case to fill gaps in a respondent's questionnaire response using partial {adverse facts available}." *Corinth Pipeworks Pipe Indus. SA v. United States*, 154 F.4th 1356, 1368 (Fed. Cir. 2025). "This is particularly true where the missing or deficient information concerns core data." *Id.* This Court recognized a similar principle in a case cited by plaintiffs. *See* Pl. Br. at 25. In that case, *Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*, No. 10-00059, 2011 WL 4829947 (Ct. Int'l Trade Oct. 12, 2011), the Court sustained Commerce's application of adverse facts available to all of

30

plaintiff's factors of production and sales submissions because the subject infirmities involved core inputs. *Id.* at 14. The Court reasoned, "{t}his {was} not a case where the responses were deficient with respect to a discrete category of information, such that partial {adverse facts available} would be required." *Id.*

The Court further explained: "{W}hen Commerce determines that deficiencies and inconsistencies call into question the credibility of the entirety of a respondent's . . . factors of production and sales, Commerce acts reasonably in applying {total adverse facts}." *Id.* Likewise, in this case, without reliable steel factors of production data for an administrative review concerning welded stainless steel pressure pipe, Commerce was unable to fill the gap in the record without such core data. *See* IDM at 5. It is also reasonably discernible from the record that Commerce was concerned with Vinlong's data to support the other factors given that Vinlong had admitted to inadequate recordkeeping concerning a material input.

In sum, the necessary information was missing from the record because Vinlong failed to provide its factors of production data in the form and manner requested by Commerce, and the deficient data on the record was unverifiable as it lacked sufficient evidence supporting its reliability. IDM at 5; *see also* 19 U.S.C. § 1677e(a)(1), (b)(2)(B), (b)(2)(D). These shortcomings, moreover, were directly tied to Vinlong's failure to maintain adequate records, which is tantamount to a failure to act to the "best of its ability" in the administrative review. *See Nippon Steel Corp.*, 337 F.3d at 1382. Therefore, based on the record evidence and pursuant to 19 U.S.C. § 1677e(a) and (b), Commerce correctly applied total adverse facts available to Vinlong.

31

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' motion for

judgment on the administrative record and sustain Commerce's *Final Results*.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

*Of Counsel*:

CHARLIE CHUNG
Attorney
Office of the Chief Counsel
  for Trade Enforcement & Compliance
U.S. Department of Commerce

CLAUDIA BURKE
Deputy Director

*s/Mollie L. Gropp*
MOLLIE L. GROPP
Senior Counsel for Management
U.S. Department of Justice
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, DC 20044

April 22, 2026

*Attorneys for Defendant*

32

## CERTIFICATE OF COMPLIANCE

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that "Defendant's Response To Plaintiffs' Rule 56.2 Motion For Judgment On Administrative Record" complies with the Court's type-volume rules as well as the word-count limitation set forth in Standard Chambers Procedure ¶ 2(B)(1).  In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.  This brief contains 9,161 words.

/s/Mollie L. Gropp
MOLLIE L. GROPP

April 22, 2026